UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 2:11-cr-00092-JAW |
| | ) | |
| CATHERINE NANTUME | ) | |

**ORDER ON OBSTRUCTION OF JUSTICE ENHANCEMENT**

The Court finds that the Defendant in this sham marriage case willfully and intentionally lied in an effort to mislead the jury and the Court imposes the two-level enhancement for obstruction of justice under United States Sentencing Guideline § 3C1.1.

## I.   STATEMENT OF FACTS

On March 28, 2012, a jury found Catherine Nantume guilty of Count One of the Indictment, which alleged that she engaged in a conspiracy to defraud the United States, a violation of 18 U.S.C. § 371.  *See Jury Verdict* (ECF No. 56); *Indictment* (ECF No. 1).   Specifically, the jury found Ms. Nantume guilty of conspiring to enter into a sham marriage with Timothy Dancsak, a United States citizen, for the purpose of obtaining a change in her immigration status.  *See Indictment* at 2.[1]  The trial lasted three days.

### A.   The Marriage and CIS Petitions

There is no dispute that on August 19, 2002, Catherine Nantume and Timothy Dancsak were married in Auburn, Maine, and that the couple later filed

---

[1]   The Indictment referred to Ms. Nantume's spouse only as "T.D."; the Court uses his full name, Timothy Dancsak.

documents with the United States Citizenship and Immigration Services (CIS) to obtain a change in Ms. Nantume's immigration status based on their marriage; that they attended an interview with CIS on March 4, 2004; and that CIS granted Ms. Nantume a change in her immigration status, allowing her conditional residency status as of March 4, 2004.  There is also no dispute that Ms. Nantume later filed a petition with CIS, seeking permanent residency status; that in that petition, she represented that she and Mr. Dancsak were still married and living together; and that CIS granted her petition on January 23, 2007.  Finally, there is no dispute that on January 14, 2010, Ms. Nantume filed a petition with CIS to become a naturalized United States citizen, listing the same address for Mr. Dancsak and herself.  Thus, there is no argument about whether the couple was married and whether they used their marriage as a basis for Ms. Nantume to obtain changes in her immigration status.  The issue was whether the marriage was real or a sham.

### B.    The Government's Version

The Government contended that the marriage was a sham from its inception. It portrayed the marriage as one of a number of sham marriages arranged by a man named Rashid Kakande, a Uganda native, who himself was convicted of participating in a sham marriage conspiracy.  The Government put forth evidence that Mr. Kakande arranged for Ms. Nantume and Mr. Dancsak to marry, that Ms. Nantume and Mr. Dancsak had not met until moments before the wedding ceremony, that they dressed up and had photographs taken as if the ceremony were real, and that Mr. Dancsak actually received $500.00 (an amount less than he was

promised) for entering into the marriage.  The Government claimed that after the marriage, Mr. Dancsak traveled to Massachusetts to meet with a lawyer to sign the immigration petition, and that, after practicing with mock interviews, he and Ms. Nantume ultimately ended up attending a CIS interview in Portland.   The Government maintained that Ms. Nantume paid him small amounts of money by Western Union after the interview.  Furthermore, at one point, when he asked her for money to fix his car, she let him borrow her SUV.  Finally, the Government contended that, even though Mr. Dancsak asked Ms. Nantume for a divorce, she would not consent to one, and that they are still married.

### C.   Timothy Dancsak's Testimony

During its case-in-chief, the Government called Timothy Dancsak to testify. Mr. Dancsak was twenty-nine at the time of the trial.  *Tr. of Proceedings, Vol. I (Excerpt)*, 76:5-6 (ECF No. 67).  Mr. Dancsak testified that in 2001 and 2002, he dated a woman named Augusta Yates and it was Augusta who mentioned to him that he could make some extra cash to help someone stay in the Country.  *Id.* at 76:25-77:12; 82:14-20.  Ms. Yates told him that he could make up to $5,000.00.  *Id.* at 82:23-25.  Ms. Yates explained that the money would come in stages: first for the marriage, then for procedures like going to immigration and filling out paperwork. *Id.* at 83:5-11.  Before Ms. Yates mentioned this possibility to him, Mr. Dancsak was unaware that a person from another country could get legal residency in the United States by marrying a United States citizen.  *Id.* at 83:18-21.  Mr. Dancsak said that he was interested because he "needed the money."  *Id.* at 83:22-84:1.

3

Ms. Yates and Mr. Dancsak contacted Ms. Yates's friend Rashid Kakande, and Mr. Kakande and Catherine Nantume came to Auburn, Maine, from Massachusetts. *Id.* at 84:2-22. Mr. Dancsak had never met Ms. Nantume before. *Id.* at 85:11-14. After Ms. Nantume and Mr. Dancsak were introduced at a woman named Tina's apartment, they went to the Auburn City Hall and they got a marriage certificate. *Id.* at 86:1-7. They returned to Tina's apartment, dressed up, and went to Bonney Park, where the wedding ceremony took place. *Id.* at 86:25-87:19. Mr. Dancsak was paid $500.00 by Mr. Kakande at the end of the ceremony. *Id.* at 89:24-90:6. This was less than he had been promised and Mr. Kakande and Catherine Nantume told him that to get more money, he had to follow more steps. *Id.* at 90:7-16. After the ceremony, the newly married couple went their separate ways: he went home and his new wife, Ms. Nantume, returned to Massachusetts with Mr. Kakande. *Id.* at 90:20-23.

Sometime after the ceremony, Mr. Dancsak telephoned Ms. Nantume because he knew they had to take some further steps. *Id.* at 91:4-10. Ms. Nantume told Mr. Dancsak that he needed to meet with her and "just do some things to make it look like a legitimate marriage." *Id.* at 91:14-17. About one month after the wedding, Ms. Nantume returned to Maine and told Mr. Dancsak that they needed to "establish a bank account together and take pictures and stuff" in order to "show that we were together and we had like income together." *Id.* at 91:23-92:5.

Mr. Dancsak recalled going once to Massachusetts. *Id.* at 93:11-14. He remembered going to a lawyer and signing immigration documents. *Id.* at 93:15-

94:10.   He recognized his signature on one of the immigration documents dated August 8, 2003, and on one other immigration document.  *Id.* at 94:14-96:14.  He was not paid for signing these documents.  *Id.* at 97:8-9.  Later, Ms. Nantume asked Mr. Dancsak to attend an immigration interview.  *Id.* at 98:16-17.  Mr. Dancsak got cold feet and told Ms. Nantume that he did not want to follow through with it anymore.  *Id.* at 98:21-99:1.  Mr. Dancsak refused to go to the first scheduled interview and it was rescheduled.  *Id.* at 99:9-17.  Mr. Dancsak was convinced to go to the interview to avoid getting into trouble.  *Id.* at 99:18-100:9.

Ms. Nantume came to Maine with a list of potential questions and Mr. Dancsak and Ms. Nantume rehearsed answers in a motel room that she had rented.  *Id.* at 100:10-101:23.  They then went together to the CIS interview the next day.  *Id.* at 101:24-102:1.  Mr. Dancsak did not get paid for attending the interview.  *Id.* at 103:14-16.  He did ask to borrow money and at one point, he borrowed her car.  *Id.* at 103:25-104:18.

About two months after the wedding, Mr. Dancsak asked Ms. Nantume for a divorce, but she refused, saying that they had to follow the steps.  *Id.* at 104:19-105:4.  Ms. Nantume never consented to a divorce and as of the date of trial, they were still married.  *Id.* at 105:24-106:3.

Sometime in late 2003 or early 2004, Mr. Dancsak moved in with his girlfriend, Michelle Harmon.  *Tr. of Proceedings, Vol. II (Excerpt)*, 25:20-24 (ECF No. 68).  Mr. Dancsak acknowledged that he had not told Michelle about his marriage to Ms. Nantume.  *Id.* at 26:3-9.  It came up when Michelle became

pregnant, which was around April 2004. *Id.* at 26:10-25. Michelle told Mr. Dancsak that she wanted to get married and Mr. Dancsak had to explain to Michelle that he could not marry her. *Id.* at 27:1-4. Mr. Dancsak told Michelle that he had gotten himself "into some bad things." *Id.* at 27:5-7.

Michelle asked to meet Ms. Nantume but did not say why. *Id.* at 27:8-10; 27:25-28:4. Mr. Dancsak brought Michelle to meet Ms. Nantume at a rest stop on the Maine Turnpike near Lewiston. *Id.* at 28:15-23. When they arrived, Michelle got out of the car and went over to Ms. Nantume's SUV. *Id.* at 28:24-29:17. After Michelle spoke with Ms. Nantume, she returned to Mr. Dancsak's car and told him that Ms. Nantume had proposed that Michelle marry Ms. Nantume's cousin. *Id.* at 34:5-18. Mr. Dancsak urged her not to get involved. *Id.* at 34:22-35:1. Michelle went ahead anyway and married Ms. Nantume's cousin and Mr. Dancsak attended the wedding. *Id.* at 35:4-9. Michelle told Mr. Dancsak that she had been paid after the ceremony. *Id.* at 37:4-7.

Mr. Dancsak stated that he believed he had not been prosecuted for his role in the marriage fraud because the events took place "a long time ago." *Id.* at 42:11-16.

### D.    Catherine Nantume's Version

In her defense, Ms. Nantume took the stand and told an entirely different story. Ms. Nantume testified that she first came to the United States in 1999 and after a couple of visits, on the third trip in 2001, even though she was on a six-month visa, she overstayed the visa and remained. *Tr. of Proceedings, Vol. II*

*(Excerpt),* at 45:8-9; 46:25-47:6 (ECF No. 68).  She was twenty-two years old.  *Id.* at 48:20-23.

The way Ms. Nantume told it, in December 2001, she joined a group of Massachusetts Ugandans that were socializing with a group of Mainers.  *Id.* at 50:6-19.  As she explained it, the Mainers would sometimes come to Massachusetts on a Friday to party and the Massachusetts residents would continue the party by traveling to Maine for Saturday night, driving back to Massachusetts Sunday.  *Id.* at 50:20-51:5.  When in Lewiston, they had a friend who was a DJ in one of the clubs so they started to get to know people through him.  *Id.* at 50:10-13.

She said she met Mr. Dancsak at one of the parties in Waltham, Massachusetts.  *Id.* at 51:24-52:1; 52:7-9.  She recalled that the meeting occurred at "one of those parties that people throw after a club, like later."  *Id.* at 52:1-3.  She said he was "standing off in a corner."  *Id.* at 52:3-4.  She could not recall who approached whom, but she did remember that they "kind of just [hung] out until the morning and we exchanged numbers."  *Id.* at 52:4-6.  She thought it was either the end of December 2001 or the beginning of January 2002.  *Id.* at 53:16-19.  She thought there were about thirty people at the party.  *Id.* at 54:4-5.

Ms. Nantume testified that a couple of weeks after this party, Tim Dancsak telephoned her and said that they were coming to Massachusetts and asked to "crash at [her] house."  *Id.* at 54:8-16.  She agreed and they "kind of crashed there." *Id.* at 54:16-18.  Despite the fact that "Timmy is -- is kind of shy," she said over time

their relationship developed.  *Id.* at 55:10-17.  She recalled that Mr. Dancsak visited her in Massachusetts about four times before the wedding.  *Id.* at 55:22-56:4.

She described how they came to be married.  According to Ms. Nantume, in the spring of 2002, Mr. Dancsak and she had a conversation at Hampton Beach, New Hampshire.  *Id.* at 58:1-11.  Mr. Dancsak noticed that she was constantly checking in with her mother, Asha Kiwnuka, who was living in Massachusetts, and he chided her for doing so, telling her that she is an adult yet was behaving "like a child."  *Id.* at 56:23-57:10.  Ms. Nantume said that she told Mr. Dancsak that she would have to return to Uganda and that her mother planned to process all of her children through immigration.  *Id.* at 57:11-19.  She said that Mr. Dancsak suggested that they could get married, saying, "I think if I marry you[,] you can stay."  *Id.* at 57:19-58:17.  Ms. Nantume said she "laughed it off" because at the time Mr. Dancsak was still a teenager and she was twenty-two, and she did not feel she could "marry a teenager."  *Id.* at 58:17-22.  However, during the summer, he turned twenty and he told her, "Now I'm no longer a teenager, let's do this."  *Id.* at 58:22-25.  So she "kind of went ahead with it."  *Id.* at 58:25.  Ms. Nantume testified that she loved Mr. Dancsak.  *Id.* at 61:13-14.  She said that Mr. Dancsak told her he wanted to get married in part for love, in part for rebellion, and in part to help her. *Id.* at 61:15-18.

At the time of the marriage, Mr. Dancsak was living in Lewiston, Maine, and Ms. Nantume testified that after the marriage, she moved into his apartment in Lewiston.  *Id.* at 62:18-19.  Ms. Nantume admitted that her mother did not know

she had been married for about three months after the ceremony.  *Id.* at 62:23-63:3. She explained that she would come to Maine and stay for about four days each week and Mr. Dancsak would then come to Massachusetts and stay for two days and return.  *Id.* at 64:2-5.  However, she testified that while they were living on Lincoln Street in Lewiston, Mr. Dancsak was working as a laborer, the gas was cut off at his apartment, and the bathroom ceiling collapsed in a heavy rain.  *Id.* at 64:12-24.  Ms. Nantume decided she "[couldn't] do this" and she returned to her mother's apartment in Woburn, Massachusetts, telling her mother what she had done in marrying Mr. Dancsak.  *Id.* at 64:21-65:5.

According to Ms. Nantume, after they had been married for about seven or eight months, Ms. Nantume learned from friends that because she was married to a United States citizen, she could put "paperwork together so that [she] could get [a] work permit."  *Id.* at 65:18-25.  She went to the library and researched the issue. *Id.* at 66:1-13.  After they filed the applications, they went to the CIS interview in Portland, but she said she had no difficulty passing the interview because they were asking them about what they had done recently and "we knew what was what."  *Id.* at 67:7-19.  She denied rehearsing for the interview.  *Id.* at 67:20-21.

After a time, Ms. Nantume stopped working as a babysitter and decided to follow her mother's example and become a Certified Nurses' Aid.  *Id.* at 68:10-17. Things then "started stabilizing and [her] relationship with Timmy started to change."  *Id.* at 68:15-17.  In the beginning of 2004, their contact became "sporadic." *Id.* at 68:25-69:6.

Ms. Nantume identified six Western Union MoneyGrams that she sent to Mr. Dancsak between 2003 and 2006. *Id.* at 72:17-73:7. One of the MoneyGrams was dated May 26, 2003, and was sent to an address in Chelsea, Massachusetts. *Id.* at 73:21-74:1. Ms. Nantume explained that Mr. Dancsak had been working in southern New Hampshire and northern Massachusetts, and had gotten a job moving a few things to the Revere-Chelsea area. *Id.* at 74:5-11. He had run "into trouble" and had called her for funds. *Id.* at 74:11-12. She went to a Star Market in Wellesley, Massachusetts, and sent money to Chelsea for Mr. Dancsak. *Id.* at 74:15-24. By that time, however, their relationship had changed and it was no longer a "romantic relationship," but they were still "close as a couple." *Id.* at 75:15-20.

In 2006, Mr. Dancsak contacted her and told her he needed money, confessing much later that he had fathered a son. *Id.* at 76:18-23. She said, "it's okay, I'll be pitching in." *Id.* at 76:23-24. By that time, they were living apart: he in Maine and she in Massachusetts, but he would still come and stay with her. *Id.* at 77:6-12. She was aware that he had "started seeing somebody" and Ms. Nantume "figured it was serious" when his girlfriend had a baby. *Id.* at 77:18-22. In 2008, Ms. Nantume herself had a baby girl with another man. *Id.* at 77:23-78:5. After that, Mr. Dancsak "kind of stopped coming at all" and would only call her occasionally to tell her about "[his son][2], who's his eldest son." *Id.* at 78:13-16.

After they drifted apart, Ms. Nantume testified that she had difficulty tracking down Mr. Dancsak. *Id.* at 78:20-79:6. She said that in 2006, he "went

---

[2]     The Court has not used the child's name.

through like four or five phone numbers," she "couldn't like physically see him anywhere," and "if I needed to contact Timmy I didn't know where to find him." *Id.* On cross-examination, Ms. Nantume was asked about a number of forms that she filed with CIS, requesting changes in her immigration status. *Tr. of Proceedings, Vol. III (Excerpt)*, 26:9-41:2 (ECF No. 69). Confronted with the fact that in some of the later forms, Mr. Dancsak's name is misspelled and in handwriting different from his acknowledged signature, Ms. Nantume said that she had lost contact with Mr. Dancsak and admitted that she "filled out most of it." *Id.* at 40:19-41:2. On redirect, she said that the CIS documents filed from 2002 through 2004 all have Mr. Dancsak's accurate signature. *Id.* at 41:8-12. However, she based the inaccurate Dancsak signatures beginning in 2006 on the fact that "it was hard for me to track Timmy" after he had a child with another woman. *Id.* at 41:17-43:25.

### E.   Timothy Dancsak's Response

In rebuttal, Mr. Dancsak contradicted virtually all of Ms. Nantume's testimony. He said that from 2002 to 2006, he had three close friends and that they typically went fishing, camping, and on one occasion, whitewater rafting. *Id.* at 44:15-45:2. Mr. Dancsak had never heard of Hampton Beach. *Id.* at 45:9-10. He testified that, during the time from 2002 to 2006, he never traveled with his friends to Massachusetts, never went to clubs, never listened to DJs, never drove to Massachusetts with carloads of friends, never went to a house party in Massachusetts, and never socialized with a group of Ugandans living in Massachusetts. *Id.* at 45:11-46:20.

11

Mr. Dancsak testified that he had never met Ms. Nantume before the day they were married and had not suggested to her that they get married. *Id.* at 47:12-17. He said he did not know that a foreign citizen could get legal residency in the United States by marrying a United States citizen. *Id.* at 47:24-48:4. Mr. Dancsak also denied substantially all of Ms. Nantume's testimony about the circumstances leading up to his marriage to her. *Id.* at 48:18-49:4. Mr. Dancsak further denied that he and Ms. Nantume ever lived together at Lincoln Street in Lewiston and denied that when he lived at Lincoln Street his apartment had gas. *Id.* at 49:20-25. Mr. Dancsak denied ever asking Ms. Nantume for money to support his son. *Id.* at 50:12-14.

### F.   Rashid Kakande Corroborates Timothy Dancsak's Testimony

The Government presented the testimony of Rashid Kakande, a native Ugandan. *Tr. of Proceedings, Vol. I (Excerpt)*, 4:5-6 (ECF No. 67). Mr. Kakande had been convicted in federal court of engaging in a marriage fraud conspiracy and as of the Nantume trial, he was still incarcerated for that crime. *Id.* at 51:13-23. Mr. Kakande testified at length and essentially corroborated Mr. Dancsak's version of the Dancsak-Nantume marriage. Mr. Kakande explained that he had overstayed his own visa, had married a United States citizen, and had successfully petitioned for changes in immigration status, leading to his being granted lawful permanent residency status. *Id.* at 4:25-8:11. After his marriage fell apart, Mr. Kakande began to travel from Massachusetts to Maine, where he established a social network. *Id.* at 8:18-9:9. At the same time, people in the Ugandan exile community

in Massachusetts, knowing that he had managed to obtain a change in his immigration status through marriage, began to approach him to see if he knew an American citizen they could marry. *Id.* at 9:17-13:7. Mr. Kakande became a marriage broker between Ugandan and American citizens and received money from the Ugandans; the difference between Mr. Kakande and a legitimate marriage broker, however, is the marriages were for the most part a sham and were entered into solely for the purpose of obtaining a change in the Ugandan's residency status. *See id.* at 13:10-15:15.

Mr. Kakande described the process by which a marriage was arranged and the Ugandan was then led through the immigration process. *Id.* at 14:16-19:16. The general process—from beginning to end—was consistent with Mr. Dancsak's testimony. Mr. Kakande then described in detail a number of the marriages he had arranged. *Id.* at 19:17-29:5.

Turning to Ms. Nantume, Mr. Kakande said that he had known Ms. Nantume as a family friend. *Id.* at 29:6-10. His mother and her mother are best friends. *Id.* at 29:11-17. He confirmed that he arranged a marriage for Ms. Nantume. *Id.* at 30:8-9. He recalled that Ms. Nantume approached him about marrying someone and changing her immigration status. *Id.* at 30:10-14. Mr. Kakande contacted one of his Maine friends and they recruited Mr. Dancsak. *Id.* at 32:14-22. Mr. Kakande testified that to his knowledge, Ms. Nantume and Mr. Dancsak had never met before the day of the wedding. *Id.* at 33:3-5. Mr. Kakande continued to have contact with Ms. Nantume after the ceremony and their mothers

continued to be best friends. *Id.* at 35:20-24. Mr. Kakande testified that Mr. Dancsak never lived in Massachusetts with Ms. Nantume and she never lived in Maine with Mr. Dancsak. *Id.* at 35:25-36:4.

### G.   Tina Bayne Corroborates Timothy Dancsak's Testimony

The Government also called Tina Bayne, a Maine resident, as a witness in its case-in-chief. *Tr. of Proceedings, Vol. I,* 99:24-140:23 (ECF No. 75). Ms. Bayne generally confirmed Mr. Kakande's testimony about the marriage fraud scheme involving Ugandan and United States citizens. In fact, she had married a Ugandan named Emmanuel as part of the scheme and was paid $1,500.00 for doing so by Rashid Kakande. *Id.* at 104:2-114:23. She also went through the immigration process with her Ugandan husband, including an immigration interview in Boston with federal authorities. *Id.* at 117:19-123:10. However, Ms. Bayne left the interview when the federal officials began talking about fraud. *Id.* at 123:8-15.

Ms. Bayne also confirmed that she had acted as a recruiter of Maine residents for Mr. Kakande and received a couple hundred dollars for each recruit. *Id.* at 124:22-125:17. Specifically, she said that Mr. Dancsak had been recruited by her friend Augusta Yates to participate in the Nantume marriage, and Ms. Bayne allowed Ms. Nantume, Mr. Kakande, and Mr. Dancsak to meet at her apartment. *Id.* at 125:18-126:24. Ms. Bayne attended the Nantume-Dancsak wedding. *Id.* at 127:15-18. She testified that to her knowledge, Mr. Dancsak had never met Ms. Nantume before the day of the wedding. *Id.* at 128:6-8.

### H.   Keith Bradbury Corroborates Timothy Dancsak's Testimony

14

The Government also called as a witness in its case-in-chief Keith Bradbury, a "really close friend" of Timothy Dancsak. *Tr. of Proceedings, Vol. II,* 151:14-15 (ECF No. 76). Mr. Bradbury became involved in a sham marriage through Rashid Kakande to a woman named Caroline Kayondo. *Id.* at 155:16-157:10. Ms. Kayondo and Ms. Nantume were friends. *Id.* at 171:22-172:3. Mr. Bradbury described a process identical to the one Mr. Dancsak described: marrying a woman whom he had not met before for money, undergoing a sham ceremony, petitioning federal immigration authorities for a change in Ms. Kayondo's immigration status, and proceeding through the immigration process with her, including an immigration interview. *Id.* at 153:18-178:16. The application process was successful for Ms. Kayondo and she did obtain legal residency status. *Id.* at 176:14-16.

Mr. Bradbury confirmed that he and Tim Dancsak have been very close friends throughout this time and he said that to his knowledge Mr. Dancsak had never lived or worked in Massachusetts and that Ms. Nantume had never lived with Mr. Dancsak in Maine. *Id.* at 180:13-181:20.

## I.   Jennifer Michelle Harmon Corroborates Timothy Dancsak's Testimony

The Government called as a witness Jennifer Michelle Harmon, Mr. Dancsak's former girlfriend and the mother of their two children. *Id.* at 190:5-6; 191:18-192:13. Ms. Harmon goes by her middle name Michelle. *Id.* at 189:15-17. Ms. Harmon and Mr. Dancsak were in a relationship from January 2004 to the beginning of 2010. *Id.* at 190:8-11. They were together throughout this time and shared an apartment, meals, and regular family activities. *Id.* at 191:9-195:20. She

testified that during this time, he had never lived outside the state of Maine.  *Id.* at 195:21-23.

Ms. Harmon confirmed that when she became pregnant with their first child, she began to talk about getting married and that Mr. Dancsak was "really reluctant to talk about it."  *Id.* at 196:16-23.  Mr. Dancsak then "actually started crying and [he] told [her] that he had made a mistake a few years back or awhile back and he was trying to fix it and make it go away."  *Id.* at 196:23-197:2.  At that time, Mr. Dancsak did not explain what the problem was, but when Ms. Harmon was approached to marry someone, he explained what he had done.  *Id.* at 197:3-12.  Ms. Harmon explained that "a woman named Cathy" had called her and asked to meet her.  *Id.* at 197:19-21.  Ms. Harmon identified "Cathy" as Ms. Nantume.  *Id.* at 220:13-20.

Ms. Harmon said that she agreed to meet Ms. Nantume at a rest stop in Auburn, that Tim Dancsak went with her, that she went over to Ms. Nantume's car and after hearing Ms. Nantume's proposition, she agreed to marry Ms. Nantume's cousin, Alex, for $2,000.00.  *Id.* at 199:3-200:23.  Ms. Nantume laughed while introducing herself to Ms. Harmon as her boyfriend's wife.  *Id.* at 199:22-24.  Ms. Nantume explained the entire scheme to Ms. Harmon and told Ms. Harmon that she "got away with it."  *Id.* at 200:18-21.  Ms. Harmon agreed to participate because she was "really hard for money at the time and [she] saw money and [she] did it." *Id.* at 200:24-201:1.  When she told Mr. Dancsak, he became "pretty upset about it" and he "didn't want me to do it."  *Id.* at 202:22-25.  But she went ahead anyway.

Ms. Harmon then described in detail the wedding in which she married Ms. Nantume's cousin. *Id.* at 203:2-205:21. Mr. Dancsak attended the ceremony as did Ms. Nantume, and Ms. Harmon said that they were "very awkward" around each other and did not show any signs of affection. *Id.* at 207:21-208:8. Ms. Harmon testified about the same immigration process with Alex that others had described. *Id.* at 208:22-215:20. After immigration documents were filed, Ms. Harmon began to realize the consequences of what she was doing and she decided to end it. *Id.* at 215:25-216:5. She called immigration and asked about her options. *Id.* at 216:6-8. She later met with the immigration authorities in Portland, and on May 25, 2006, she signed a paper stating that she did not want to become involved anymore. *Id.* at 216:9-217:17. Alex came to Maine later in 2006 and they were divorced. *Id.* at 219:11-15.

### J.    Asha Kiwanuka Corroborates Catherine Nantume's Testimony

The defense called Asha Kiwanuka, Ms. Nantume's mother, to testify. *Tr. of Proceedings, Vol. III,* 272:23-273:2 (ECF No. 77). Ms. Kiwanuka confirmed the history of her coming to the United States and Ms. Nantume's later arrival in 2001. *Id.* at 273:3-275:1. Ms. Kiwanuka testified that Ms. Nantume developed a social group, including Rashid Kakande, who was the son of Ms. Kiwanuka's friend. *Id.* at 280:9-281:2. She said Ms. Nantume introduced her to Timmy. *Id.* at 281:2-3. She testified that Ms. Nantume "turned wild" and when she tried to contact Ms. Nantume, her daughter would say that "we are at a party, we are in Maine in a club, and things started to -- to change." *Id.* at 281:11-282:4. At some point, Ms.

Kiwanuka learned that her daughter had married Tim Dancsak; she did not know about the wedding before it took place. *Id.* at 283:14-23.

After the wedding, she testified that Tim Dancsak came to her house with her daughter. *Id.* at 284:14-285:6. Ms. Kiwanuka said that during this time, her daughter was not living in Massachusetts. *Id.* at 287:19-24. Ms. Kiwanuka testified that for a period of time, Tim Dancsak and Catherine Nantume lived together in Ms. Kiwanuka's apartment in Massachusetts. *Id.* at 290:17-19; 291:12-14.

## II.   THE PARTIES' POSITIONS

### A.   The Government's Argument

In its memorandum, the Government argues that the Court should impose a two-level sentencing guideline enhancement for obstruction of justice under U.S.S.G. § 3C1.1. *Gov't Mem. Supporting Obstruction of Justice Enhancement* (ECF No. 73) (*Gov't Mem.*). It contends that Ms. Nantume "perjured herself on the stand at trial." *Id.* at 1. The Government points to numerous instances in which it contends Ms. Nantume's testimony was "demonstrably false" and, in its view, deserving of a two-level enhancement. *Id.* at 3-13.

### B.   Catherine Nantume's Response

In response, Ms. Nantume contends that because the jury made no finding of perjury, the Court cannot make such a finding without violating *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *Reply Mem. of Catherine Nantume Respecting Sentencing: Obstruction of Justice Enhancement*, 3-7 (ECF No. 74) (*Def.'s Opp'n*).

She postulates ways in which the jury could have found her guilty of engaging in a conspiracy to defraud the United States without concluding that she had lied about her marriage to Mr. Dancsak.  *Id.* at 4-5.  She concludes that to impose a sentencing enhancement for obstruction of justice would violate her right to a jury determination of the facts underlying the enhancement.  *Id.* at 5-7.

## III.   DISCUSSION

### A.   The Obstruction of Justice Enhancement

Section 3C1.1 of the United States Sentencing Guidelines provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

*See* United States Sentencing Commission, *Guidelines Manual*, § 3C1.1 (Nov. 2011) (U.S.S.G.).  In Application Note 4, the Guidelines Manual gives examples of covered conduct, including "committing, suborning, or attempting to suborn perjury . . . if such perjury pertains to conduct that forms the basis of the offense of conviction" and "providing materially false information to a judge or magistrate judge." U.S.S.G. § 3C1.1, cmt. n.4, (B), (F).  At the same time, the Manual cautions:

> In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

*Id.* § 3C1.1, cmt. n.2.

"Material and deliberately false testimony at trial is a standard basis for the [obstruction of justice] enhancement, so long as the district court finds the specific elements of perjury." *United States v. Campusano*, 556 F.3d 36, 40-41 (1st Cir. 2009) (citations omitted); *see also United States v. Gonzalez*, 609 F.3d 13, 20 (1st Cir. 2010) (internal punctuation omitted). "Perjury consists of false testimony under oath concerning a matter material to the proceeding, as long as the testimony is given 'with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Shinderman*, 515 F.3d 5, 19 (1st Cir. 2008) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).

## B.    *Apprendi* **and Judicial Fact-finding**

Ms. Nantume contends that the Court does not have the authority to impose an obstruction of justice enhancement because the facts underlying the enhancement, namely the perjury itself, have not been determined by a jury. *Def.'s Opp'n* at 5-7. She urges the Court to apply the principles in *Apprendi* and *Blakely v. Washington*, 542 U.S. 296 (2004), and conclude that it cannot apply the obstruction of justice enhancement because to do so would be "inconsistent with the Sixth Amendment right to jury trial." *Def.'s Opp'n* at 6-7.

Ms. Nantume's argument runs counter to well-established First Circuit post-*Apprendi/Blakely* precedent. Since 2004, when the United States Supreme Court decided *Blakely*, the First Circuit has consistently held that "[d]istrict courts may impose a sentencing enhancement for obstruction of justice, when, inter alia, they find by a preponderance of the evidence that a defendant has committed perjury." *Gonzalez*, 609 F.3d at 20 (citations omitted); *see also Campusano*, 556 F.3d at 40-41;

20

*Shinderman*, 515 F.3d at 18-20; *United States v. Gobbi*, 471 F.3d 302, 314 (1st Cir. 2006).  The Court need not review the historical developments of sentencing law beginning with *Apprendi* and continuing through *United States v. Booker*, 543 U.S. 220 (2006).  It suffices to say that Ms. Nantume is simply wrong.  She does not have a right to a jury trial to determine whether an obstruction of justice enhancement should be applied to her sentencing guideline calculation under the United States Sentencing Guidelines.  As the First Circuit observed in *United States v. Ziskind*, 491 F.3d 10 (1st Cir. 2007), "*Booker* did not hold that the Sixth Amendment prohibits judicial factfinding; it held only that the Sixth Amendment is violated by a mandatory guideline sentence scheme predicated on such factual determinations. Thus, we have consistently rejected the argument that judicial factfinding, by itself, violates *Booker*."  *Id.* at 17 (citations omitted).

### C.   Whether Ms. Nantume Committed Perjury

On the question of whether Ms. Nantume obstructed justice by committing perjury, the Court looks to the jury verdict for guidance and strives to act in a manner consistent with the verdict.   However, the Court, not the jury, decides whether the sentencing guideline enhancement applies.  Moreover, the jury in this case returned a general verdict of guilty, *see Jury Verdict Form* (ECF No. 56); Ms. Nantume's attempt to draw support from the guilty verdict is unavailing.

The primary issue in this case was whether Ms. Nantume's marriage to Mr. Dancsak was real or a sham.  Here, the conflicting stories heard at trial cannot be reconciled: the marriage cannot have been both real and a sham.  The prosecution witnesses uniformly testified that Mr. Dancsak did not know Ms. Nantume before

they were married and that their marriage was part of a greater marriage fraud scheme that Mr. Kakande had originated and promoted. Mr. Dancsak, Mr. Kakande, Ms. Bayne, Mr. Bradbury, and Ms. Harmon all testified that the Dancsak-Nantume marriage was a sham: that Ms. Nantume entered into the marriage solely to gain a change in her immigration status and that Mr. Dancsak entered into it solely for money.

By contrast, Ms. Nantume (and to a much lesser extent her mother) testified that the marriage was legitimate. Ms. Nantume testified that she got to know Mr. Dancsak while partying with a crowd of Mainers both in Maine and Massachusetts, that she fell in love with him, that he suggested the marriage, that they were legitimately married, and that while the immigration petitions were being administratively resolved, they then grew apart as some couples do.

On this central issue—the true nature of the Dancsak-Nantume marriage— having had the opportunity to see the witnesses and evaluate their credibility, the Court finds that Catherine Nantume's version of the facts is utterly fanciful and that she repeatedly and consciously lied under oath during her federal trial. The Court believes virtually none of Ms. Nantume's testimony about her marriage to Timothy Dancsak. The Court itemizes some of its findings that directly contradict Ms. Nantume's testimony:

(1)    Ms. Nantume did not party with Mr. Dancsak and Mr. Dancsak's friends in Maine before meeting Mr. Dancsak;

(2)    Mr. Dancsak and his friends in Maine did not party with Ms. Nantume and her Ugandan friends in Massachusetts;

(3)     Ms. Nantume did not know and had never met Mr. Dancsak before they were married on August 19, 2002;

(4)     Mr. Dancsak did not know and had never met Ms. Nantume before they were married on August 19, 2002;

(5)     Ms. Nantume did not meet Mr. Dancsak at a party in Waltham, Massachusetts;

(6)     Mr. Dancsak and Ms. Nantume did not date each other before the marriage;

(7)     Mr. Dancsak did not suggest to Ms. Nantume that they get married;

(8)     Mr. Dancsak and Ms. Nantume were never together at Hampton Beach, New Hampshire, and in fact, Mr. Dancsak does not know where Hampton Beach, New Hampshire, is;

(9)     Ms. Nantume did not tell Mr. Dancsak that he was too young for her to marry;

(10)    Mr. Dancsak did not repeat his marriage offer to Ms. Nantume after he turned twenty;

(11)    Ms. Nantume did not live with Mr. Dancsak in the Lewiston, Maine, area at any time;

(12)    Mr. Dancsak has never worked in New Hampshire and has never worked in Massachusetts;

(13)    Ms. Nantume and Mr. Dancsak never lived together anywhere as a married couple and were never intimate;

(14)    Ms. Nantume and Mr. Dancsak were never in love with each other and, in fact, barely knew each other;

(15)    Ms. Nantume and Mr. Dancsak rehearsed their interview with CIS in Portland in order to make their marriage appear legitimate, when in fact it was not;

(16)    Ms. Nantume and Mr. Dancsak misrepresented the true state of their marriage to CIS authorities; and

(17)    Ms. Nantume never paid any money to Mr. Dancsak to support his child with another woman.

The Court finds that Ms. Nantume committed perjury by giving false testimony under oath concerning matters material to the proceeding.  *See Shinderman*, 515 F.3d at 19.  Ms. Nantume knowingly, willfully, and repeatedly lied under oath when she testified before a federal jury in Portland on March 27, 2012.  She did not give her false testimony inadvertently, "as a result of confusion, mistake, or faulty memory," *Shinderman*, 515 F.3d at 19; rather, she lied deliberately, to fool the jury into acquitting her.  Accordingly, the Court imposes the two-level enhancement for obstruction of justice under the United States Sentencing Guidelines.  *See* U.S.S.G. § 3C1.1, cmt. n.4, (B).

## IV.   CONCLUSION

Over the objection of the Defendant, the Court imposes the two-level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice and ORDERS the Clerk to schedule this matter for sentencing at the mutual convenience of the Court and the parties.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 9th day of October, 2012

24